839 So.2d 1063 (2003)
Charles A. CULOTTA, Plaintiff-Appellee,
v.
A.L. & W. MOORE TRUCKING COMPANY, Defendant-Appellant.
No. 35,344-WCA.
Court of Appeal of Louisiana, Second Circuit.
March 5, 2003.
*1064 Joseph B. Stamey, Natchitoches, for Appellant.
David P. Daye, Shreveport, for Appellee.
Before BROWN, GASKINS, and KOSTELKA (Pro Tempore), JJ.
BROWN, C.J.
Defendant, A.L. & W. Moore Trucking Company ("A.L. & W. Moore"), appeals from a judgment awarding plaintiff, Charles A. Culotta, supplemental earnings benefits ("SEB"), penalties and attorney fees, and ordering defendant to pay for plaintiff's back surgery. For the reasons set forth below, we affirm in part and reverse in part.

Facts
Charles A. Culotta was in the course and scope of his employment as a truck driver for A.L. & W. Moore when he was involved in an accident on or about March 21, 1996, in downtown Houston, Texas. Mr. Culotta was taken to a local hospital, X-rayed and released. He returned to Shreveport the following day and sought medical treatment for lower back pain from Dr. Austin Gleason, a specialist in orthopedics. Dr. *1065 Gleason began a program of intensive physical therapy.
Mr. Culotta began receiving temporary total disability ("TTD") benefits after his accident at a rate of $265.40 per week. Mr. Culotta had worked for A.L. & W. Moore for five years. His pay consisted of 25% of the fee collected for each load that he hauled. The TTD benefits calculation was made by a third party administrator, Sonia Barnett. The $265.40 represents two-thirds of Mr. Culotta's average weekly wage, based upon his $15,127.80 earnings for 26 weeks prior to the accident. Ms. Barnett obtained Mr. Culotta's average weekly wage by dividing $15,127.80 by 152 days of work and multiplying by four according to La.R.S. 23:1021(10)(d). Mr. Culotta contested this calculation because he disagreed with the number of days worked.
While Mr. Culotta was collecting TTD benefits, he began working at Culotta Pallet, a pallet recycling business allegedly owned by Mr. Culotta's three sons. Videotape was introduced into evidence showing Mr. Culotta lifting and stacking pallets, which weigh 20 to 40 pounds, driving a forklift and a truck. Mr. Culotta admitted that he spends his days at the facility and drives loads of pallets in town and on occasions, out of town, but he claimed that he does not do significant work. During his testimony, he frequently referred to the business as though it were his business, but claimed that he had no ownership interest in the business. He insisted that he was not paid for his efforts at the pallet company. He did have authority to sign checks for the business and take money as needed. He testified that his sons, who owned the business, did not receive regular paychecks for their work and only took money from the business as needed. Mr. Culotta testified that he received from his sons approximately $700 per month to pay off his credit cards. He stated that he lived with his mother and did not pay rent or other household or living expenses.
On October 17, 1997, A.L. & W. Moore suspended compensation benefits due to Mr. Culotta's alleged failure to give notice of his employment at the pallet company. Mr. Culotta filed a disputed compensation claim contesting the termination of benefits and demanding payment for surgery and penalties and attorney fees. Trial did not take place until June and August of 2000.
The workers' compensation judge ("WCJ") found that Mr. Culotta needed back surgery as recommended by Dr. Marco Ramos, one of his treating physicians, but did not award penalties and attorney fees on that issue, finding it to be reasonably contested. The WCJ concluded that A.L. & W. Moore had underpaid benefits and raised the compensation rate from $264.40 to $283.86. The WCJ further found that A.L. & W. Moore had acted arbitrarily and capriciously in failing to recalculate the benefits when Mr. Culotta contested the calculation and awarded him $2,000 in penalties and $2,500 in attorney fees.
The WCJ also concluded that on November 16, 1996, Mr. Culotta began earning at least $750 per month at Culotta Pallet, although he was not capable of earning 90% of his pre-injury wages. Accordingly, she awarded TTD benefits at the corrected amount from the date of the accident through November 16, 1996 and SEB subsequent to that date, giving credit to A.L. & W. Moore for benefits it had paid until October 17, 1997. No penalties or attorney fees were awarded on this claim. Costs were assessed against A.L. & W. Moore. It is from this judgment that A.L. & W. Moore has appealed.[1]

*1066 Discussion

On appeal, A.L. & W. Moore disputes several factual findings of the WCJ, including the finding that Mr. Culotta was entitled to SEB, the computation of Mr. Culotta's average weekly wage under La.R.S. 23:1021(10)(d), the award of penalties and attorney fees and the finding that Mr. Culotta needs back surgery.
Factual findings in a workers' compensation case are subject to the manifest error or clearly wrong standard of appellate review. Smith v. Louisiana Dep't of Corrections, 93-1305 (La.02/28/94), 633 So.2d 129; Freeman v. Poulan/Weed Eater, 93-1530 (La.01/14/94), 630 So.2d 733. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Freeman, supra; Stobart v. State, 617 So.2d 880 (La.1993); Mart v. Hill, 505 So.2d 1120 (La.1987). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Stobart, supra. Thus, "if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990).
Claimant's Entitlement to SEB
The WCJ concluded that Mr. Culotta was working at Culotta Pallet Company as of November 16, 1996, earning $750 per month, and awarded SEB from that date until the present time. She also gave A.L. & W. Moore credit for $20,733, representing TTD benefits paid through October 17, 1997. A.L. & W. Moore contends that Mr. Culotta is not entitled to SEB.
The burdens of proof in an SEB workers' compensation case were set out by the Louisiana Supreme Court in Banks v. Industrial Roofing & Sheet Metal Works, 96-2840 (La.07/01/97), 696 So.2d 551, 556, as follows:
"The purpose of SEBs is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident." Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52, 55 (La.1993). An employee is entitled to receive supplemental earnings benefits (SEBs) if he sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his average pre-injury wage. La.R.S. 23:1221(3)(a). Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. Freeman, supra. "Th[is] analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage." Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989). Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs or establish the employee's earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. La.R.S. 23:1221(3)(c)(i); Daigle, 545 So.2d at *1067 1009. Actual job placement is not required. Romero v. Grey Wolf Drilling Co., 594 So.2d 1008, 1014-15 (La.App. 3d Cir.1992). The amount of SEBs is based upon the difference between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity. La. R.S. 23:1221(3)(a).
Thus, determination of whether an injured employee is entitled to SEB involves a shifting burden of proof. Initially, the employee bears the burden of proving, by a preponderance of the evidence, that, as a result of a work-related accident, he is unable to earn at least 90 percent of his pre-injury salary. Once the employee has met his burden of proof, the burden shifts to the employer to defeat the employee's claim for SEB, or "to establish the employee's earning capacity." Banks, supra at 556. In order to do that, the employer is required to prove "that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region." Id.
A.L. & W. Moore contends that the WCJ erred in finding that Mr. Culotta showed by a preponderance of the evidence that he was unable to earn 90% of his previous wages and was therefore entitled to SEB. A.L. & W. Moore introduced video surveillance of Mr. Culotta actively working for several days in February, March, August and September of 1999. He was videotaped driving a forklift, helping secure loads, lifting and stacking pallets and other activities at Culotta Pallet Company, a company Mr. Culotta contends is owned by his sons. Mr. Culotta claimed that he received no compensation for his work, although his sons apparently covered any credit card charges he incurred. While testifying, Mr. Culotta made statements that implied that he is the owner or manager of the business. For example, he referred to "his customers" and stated, "I've got pallet builders...." A.L. & W. Moore contends that Mr. Culotta is the true owner of Culotta Pallet Company.
Mr. Culotta continued to see Dr. Gleason on into early 1997. Dr. Gleason believed that Mr. Culotta could work, but could not return to his previous job as a truck driver if it required heavy lifting, such as covering the load with an 80-pound tarp or climbing and crawling. In June of 1997, Mr. Thomas Mathews, a vocational rehabilitation counselor, attempted to contact Mr. Culotta at his home, but was told he was at work. He eventually interviewed Mr. Culotta about his interests, abilities and possible employment opportunities. He referred Mr. Culotta to several job openings. Mr. Culotta applied for a job as a driving instructor at Diesel Driving Academy. However, even though he has driven a truck for 34 years and once taught truck driving at USA Truck, Mr. Culotta testified that he failed the driving test. Mr. Mathews testified that he learned in an e-mail that a Diesel Driving Academy representative said that Mr. Culotta was not hired because he was not serious about the job.
Mr. Culotta testified that he also looked into the possibility of driving a school bus, but there was apparently a waiting list. He did not follow up on that or any of other jobs mentioned by Mr. Mathews, stating:
I am just not going to go from a "30,000 a year job to a 5 or $6,000 a year job. I'm just not going to do it."
After retaining counsel, Mr. Culotta was referred to Dr. Ramos, a neurosurgeon. Mr. Culotta made no further effort to seek employment, stating that Dr. Ramos said that he could not work.
The WCJ concluded that Mr. Culotta could work based upon his "active employment *1068 at Culotta Pallet," and could earn at least $750 per month, which was the projected salary he would have earned working part-time at Diesel Driving Academy.
We conclude that the WCJ was clearly wrong in concluding that Mr. Culotta carried his burden by a preponderance of the evidence that he could not earn 90% of his pre-injury wages. In fact, the evidence is quite substantial that Mr. Culotta is capable of working full-time in gainful employment, as evidenced by the work he performs at Culotta Pallet Company. Mr. Culotta presented evidence that he was not making 90% of his pre-injury wages working for his sons, but he failed to produce evidence that he could not earn 90% of his pre-injury wages. In fact, his testimony indicated that he was quite happy with the working arrangement he had with his sons and had no desire to seek employment elsewhere. Even the WCJ concluded that Mr. Culotta was quite capable of working. Unfortunately, she did not require Mr. Culotta to carry his burden by a preponderance of the evidence as required by Banks, supra. Accordingly, Mr. Culotta is not entitled to SEB.
Recalculation of Benefits under La. R.S. 23:1021(10)(d)
A.L. & W. Moore paid Mr. Culotta TTD benefits until October 17, 1997, when it "suspended" payment of benefits because of Mr. Culotta's failure to report his employment with Culotta Pallet. The WCJ concluded that Ms. Barnett, the adjuster who calculated Mr. Culotta's benefits, arbitrarily and capriciously miscalculated the number of days Mr. Culotta worked by ten days; rather than 152 days worked, the actual number of days worked was 142. Based upon this miscalculation, the WCJ assessed penalties and attorney fees against A.L. & W. Moore.
At the time of Mr. Culotta's accident, La.R.S. 23:1021(10) provided in pertinent part:
"Wages" means average weekly wage at the time of the accident. The average weekly wage shall be determined as follows:
* * *
(d) Other wages. If the employee is employed on a unit, piecework, commission, or other basis, his gross earnings from the employer for the twenty-six week period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said twenty-six week period and multiplied by four; however, if such an employee has worked for the employer for less than a twenty-six week period immediately preceding the accident, his gross earnings from the employer for the period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said period and multiplied by four.
Ms. Barnett testified that she included in her calculation of days worked those days that Mr. Culotta was waiting out of town to bring a new load to another destination. She stated it was customary in the industry to include these days as work days. This custom applies to worker's "standing-by" on the premises for purposes of establishing whether an accident occurs in the course and scope of employment. See H. Alston Johnston, 13 Louisiana Civil Law Treatise: Worker's Compensation, § 162 (West 1994). However, we find no compelling reason to apply this rule to the calculation of the average weekly wage. Mr. Culotta was not compensated while he was "off duty" and therefore the WCJ correctly excluded those days from the payment calculation.
Mr. Culotta contends that the trial court erred in counting fractional work days as full days in the wage calculation. The WCJ expressly rejected Mr. Culotta's argument *1069 that partial workdays should not be considered as full work days. Under the specific circumstances of this case, we cannot say this finding is clearly wrong or constitutes an error of law. Accordingly, we affirm that portion of the WCJ's judgment holding A.L. & W. Moore liable for underpayment of TTD benefits from March 30, 1996, until November 15, 1996, the date upon which the WCJ found that Mr. Culotta was entitled to SEB. Because we find that Mr. Culotta failed to show that he is entitled to SEB, there is no question of underpayment beyond November 15, 1996.
Penalties and Attorney Fees
The facts in this case do not support an award of penalties and attorney fees. Mr. Culotta did not contest the calculation of his benefits until September of 1997, almost a year after the WCJ found that he had been working at Culotta Pallet. We conclude that the WCJ erred in imposing penalties and attorney fees in this instance.
Entitlement to Back Surgery
In its final assignment of error, A.L. & W. Moore contests the finding that Mr. Culotta needs surgery. Defendant argues that the two orthopedists who examined Mr. Culotta, Drs. Gleason and Goodman, did not believe that back surgery on the herniated disks would help claimant's back. The WCJ apparently gave more weight to the testimony of Dr. Ramos, a neurosurgeon.
The record contains the deposition testimony of the four physicians Mr. Culotta saw regarding his lower back pain. Initially, he saw Dr. Gleason, who started physical therapy treatment three times per week. Because Mr. Culotta was dissatisfied with the progress of his treatment, Dr. Gleason referred him to a chiropractor, Dr. K.E. Wojcik. Mr. Culotta subsequently returned to Dr. Gleason for more physical therapy. Mr. Culotta continued to complain about pain in his lower back and discussed surgery with Dr. Gleason, who did not recommend surgery, stating that Mr. Culotta's degenerative and bulging disk was a nonsurgical situation.[2] Dr. Gleason released Mr. Culotta, stating that Mr. Culotta could return to some gainful occupation, although he could not do some of the functions of his previous job description.
Mr. Culotta sought treatment from other physicians. Approximately three months after the accident, he saw Dr. Carl Goodman, an orthopedic surgeon, complaining of low back and right hip pain. Dr. Goodman examined and tested Mr. Culotta, but did not order X-rays or an MRI. He recorded that Mr. Culotta was a normal appearing male who walked without a limp and was able to stand on his heels and toes without weakness. Mr. Culotta showed limited movement on bending forward and backward. Movement in both his legs and his leg strength were normal. His reflexes at the knee and ankle were normal and there was no evidence of spinal compression. Dr. Goodman told Mr. Culotta that exercise therapy would probably get him well and that he should be able to return to work as a truck driver in three or four weeks. This was the only time that Dr. Goodman saw Mr. Culotta.
In the Fall and Winter of 1997, Mr. Culotta saw Dr. Marco A. Ramos and Dr. Anil Nanda, both neurosurgeons. Mr. Culotta saw Dr. Ramos for the first time on October 1, 1997. Mr. Culotta complained of excruciating pain in his lower back. Dr. Ramos examined an MRI conducted in 1996 at Dr. Gleason's request and ordered *1070 a new MRI, which was performed on October 20, 1996. Dr. Ramos concluded by comparing the two MRIs that Mr. Culotta had two herniated disks at L4-5 and L5-S1 and that the "moderate" congenital spinal canal stenosis (narrowing) visible in the first MRI was "marked" spinal stenosis. Dr. Ramos equivocated, however, when he was asked whether the second radiological reading indicated that the stenosis was greater. He did indicate that the stenosis was not due to trauma, but was secondary to the herniated disk problem. Dr. Ramos discussed surgery as an option for Mr. Culotta. He recommended a microdiskectomy, that is, removal of the herniated nucleus pulposus; basically, according to Dr. Ramos, a laminectomy. Dr. Ramos believed that the surgery would not necessarily improve Mr. Culotta's pain situation, but would improve his functional capabilities for walking and lifting.
Mr. Culotta saw Dr. Nanda, professor and chairman of the Department of Neurosurgery at the LSU School of Medicine in December of 1997. In a letter dated December 9, 1997, addressed "To Whom It May Concern," Dr. Nanda stated that review of Mr. Culotta's MRI "showed moderate stenosis at L4-5 and L5-S1 and an old compression fracture at L2." Dr. Nanda further stated that he was "not sure if his pain is secondary to the old fracture since the lumbar stenosis at L4-5 and L5-S1 may not be contributing to his pain." Dr. Nanda stated in the letter that he did not feel that a laminectomy was indicated for pure back pain and that Mr. Culotta was not very pleased about that. Dr. Nanda had a CAT scan done which confirmed the stenosis, but he felt that surgery presented only a 50% chance of improvement.
A.L. & W. Moore points out that while Mr. Culotta was complaining of pain and severe physical limitations to Dr. Ramos, he was actually running a pallet business and doing physical labor that contradicts his claims to the neurosurgeon. A.L. & W. Moore also notes that claimant's complaints to Dr. Ramos of excruciating pain and physical impairment were not consistent with his complaints to Dr. Nanda, whose opinion was that surgery had only a 50/50 chance of success.
The WCJ concluded that Mr. Culotta should be allowed to go forward with the surgery based upon the testimony of Dr. Ramos. Based upon our review of the record, we conclude that the WCJ did not commit manifest error in determining that Mr. Culotta was entitled to back surgery.

Conclusion
For the reasons stated, the judgment of this court is as follows:
Those portions of the WCJ's judgment: (1) awarding SEB from November 16, 1996, until the present; and (2) imposing penalties and attorney fees are REVERSED. The recalculated award of TTD benefits from March 21, 1996, through November 16, 1996, is AFFIRMED. In all other respects, the judgment of the WCJ is AFFIRMED.
Each party is hereby ordered to pay its own costs of appeal.
NOTES
[1] Mr. Culotta filed a brief which included an answer to the appeal, arguing that the judgment of the WCJ was correct and requesting dismissal of the appeal at defendant's cost.
[2] Dr. Gleason testified that Mr. Culotta could not understand why his condition did not call for surgery. Dr. Gleason explained that 80 to 90% of patients with similar conditions are treated without surgery.